This case involves a question of contract law. The specific issue is whether damages for breach of provisions requiring notice of termination of a contract are limited to profits that would have been earned during the notice period called for in the contract, or whether the damages recoverable include profits that, but for the cancellation of the contract, would have been earned beyond the period of the notice provision.
Smalley Transportation is an authorized common carrier and contract carrier engaged in the interstate motor transportation of goods for hire.[1] Bay Dray was established in March 1988 as a closely held, subchapter S corporation, which independently owned and operated a fleet of trucks and vans. Cynthia Parker owned 75% of the stock and Chris Keeney, Bay Dray's general operations manager, owned 25%. Bay Dray handled domestic city-to-city van traffic and inland transportation of containerized cargo for steamship lines.
During 1988 and 1989, Bay Dray was transporting interstate van and containerized cargo pursuant to an agency agreement with Hall Systems, another authorized interstate carrier.[2]
In November 1989, because of dissatisfaction with Hall Systems, Bay Dray canceled its agency contract with Hall and entered into a similar relationship with Smalley Transportation. Bay Dray would typically conduct business through a larger, authorized carrier such as Hall Systems or Smalley for two reasons: the larger carrier had operating authority and could provide liability insurance at a cheaper rate and could also provide a consistent cash flow to the smaller company by paying the smaller company on a weekly basis a percentage of all revenues generated by freight bill during the previous week.
On November 10, 1989, Bay Dray and Smalley entered into a written agency agreement. Under this agreement, Bay Dray located its own customers and set its own rates. This agreement provided for payment to Bay Dray of 85% of all revenues generated on a weekly basis. During the week, all freight bills would be entered in the computer and the information would be sent to Smalley. Revenues for the week would be totalled as of midnight of each Thursday, and a check representing 85% of those revenues would be mailed to Bay Dray via Federal Express on the following Thursday. The agency agreement was for an unspecified term but could be canceled by either party upon 30 days' written notice.
On November 29, 1989, Bay Dray and Smalley executed a contractor operating agreement. This agreement provided Bay Dray with the operating authority and liability and cargo insurance for its truck operations. It provided the necessary authorization for the trucks to be on the road and operating. This agreement was terminable upon 10 days' notice. The notice provisions relating to termination of the agency agreement and the contractor operating agreement are standard in the industry. *Page 1184 
In August 1990, before entering into the agency agreement with Smalley, Bay Dray had entered into an agency agreement with Dynasty Transportation, Inc. This agreement also provided operating authority and insurance. Bay Dray began using Dynasty to haul containerized cargo in the fall of 1990. From December 1988 to December 1990, Bay Dray was often approached by other truck lines, such as Central Division from North Carolina, to enter into agency agreements.
On December 11, 1990, Bay Dray received notice that Smalley intended to cancel the contracts. On that date, Chris Keeney received a telephone call from Tom Kenney, Sr., of Smalley Transportation, informing him that the Special Commodities Division of Smalley was going to be shut down and that the contracts with Bay Dray were being canceled. Chris Keeney thereafter received written notices of cancellation of the agency agreement and the contractor operating agreement. The notices were dated December 13 and 14, 1990, and stated that the cancellation would be effective December 14, 1990. The notice explained that, as of that date, the insurance coverage would be canceled and that all movement/dispatches of Smalley freight had to cease.
Bay Dray requested an extension of time, but its request was denied. Smalley's president, Richard T. Skillinger, testified that he decided in the middle of November 1990 to shut down the Special Commodities Division of Smalley "because of economics" and because that division had lost money for two consecutive years. Two Smalley employees, Tom Kenney, Jr., Smalley's general manager, and John Gonska, its revenue controller, testified that they discussed the shutdown order with Skillinger and recommended giving the agency carriers at least one week's notice, but that Skillinger said "don't tell anyone." Smalley canceled 16 agency carriers that day without the required notice.
Gonska further stated that Skillinger's decision to shut down the division was made at least three weeks before notice was given to any agency carrier, that Skillinger decided to give "very limited notice," and that Skillinger insisted that no advance word get out to anyone. To explain the lack of notice, Skillinger testified:
 "Having been involved in the liquidation and shut down of approximately ten to fifteen carriers throughout the country, recognizing the ramifications, everything from strikes to computer sabotage, to disruption of records, chasing equipment all the way across the country — you never know what type of reaction you are going to get from the associates that you are telling them they are no longer in work. So rather than taking a chance of giving them sufficient notice to cause you . . . more losses, the decision was made to go ahead with very short notice."
(R. 236.)
At trial, Bay Dray asserted that when Smalley withdrew its operational authority, insurance, and weekly financing, Bay Dray: 1) was producing over $1.6 million in yearly revenue and was Smalley's second largest agency carrier; 2) had, in reliance upon its agency contract with Smalley, invested or incurred debt of over $400,000 for equipment and was operating 9 tractors and 15 trailers at its own cost; 3) was paying debt service of $13,000 a month; and 4) had commitments to owner/operators working under it.
There was evidence that Bay Dray, at the time of the cancellation, owed creditors $40,000 plus fuel, tire, and miscellaneous expenses, not including salaries, equipment, and mortgage payments, and needed a $30,000 per week cash flow to meet these obligations.
After receiving the notification of cancellation on Tuesday, December 11, 1990, Bay Dray accepted no more freight from customers and called its trucks home. Bay Dray canceled all of its previous orders, and on Friday, December 14, 1990, Keeney notified all drivers and owner/operators of the cancellation of the contract. There was also evidence that Bay Dray contacted several companies in hopes of securing another agency, and that its cash flow from Smalley was cut off. Bay Dray presented evidence that within a few days competitors took Bay Dray's business and customers. *Page 1185 
According to Bay Dray, it lost over 60 customers.
On December 19, 1990, Keeney wrote to Bay Dray's creditors, informing them of the situation. He indicated that locating another agency "can and will be accomplished" and that Bay Dray was not going out of business.
Bay Dray's position at trial was that it shut down because there was no viable, reputable, or established regulated carrier in the area that was big enough to service Bay Dray's financial needs and/or that had the contractual freedom to do so. Because of the size and volume of business that Bay Dray was creating, Bay Dray determined that Hall Systems was the only large regulated carrier operating in the region that would be adequate. However, Hall Systems already had an exclusive agent in the area. According to Bay Dray, because of the lack of viable stay-in-business options available, Cynthia Parker and her husband, Tim, told Keeney that they would not be entering into another agency agreement after December 14, 1990. Chris Keeney testified that had Smalley complied with the full 10-day operational notice, he believed he "would have found some way for those trucks to operate."
At trial, Bay Dray sought to prove that its entire business was lost because it did not receive the amount of notice required for termination of the contracts, and it offered the testimony of Joe Lawrence, Bay Dray's accountant, for the purpose of valuing the business. Smalley filed a motion in limine, seeking to exclude the testimony of Lawrence and, in the alternative, moved for a continuance of the trial on the grounds that Lawrence had not been earlier identified as an expert and the nature of his opinions had not earlier been disclosed in accordance with the general pre-trial order. These motions were denied.
Bay Dray sought to recover the full value of its business, which its expert, Lawrence, claimed was equal to seven years of anticipated net profits. Before trial, Smalley moved for an order in limine excluding any testimony as to profits allegedly lost or financial losses allegedly incurred after
January 13, 1991 (30 days after the effective date of written notice of termination). Such testimony, Smalley contended, was irrelevant to the proper measure of damages because, it argued, under Alabama law, damages for breach of a notice provision were limited to the profits or earnings that would have been realized during the notice period. At trial, over a continuing objection by Smalley, the trial court allowed Bay Dray's expert, Joe Lawrence, to testify as to anticipated net profits of approximately $271,000 over the next seven years.
At the close of Bay Dray's case, Smalley moved for a directed verdict as to any claim for damages beyond the notice period. The court denied that motion. Smalley renewed it at the close of all evidence, and the court again denied it. In addition, Smalley requested a jury instruction stating that any damages were limited to those occurring during the notice period. The trial court refused to give this instruction.
After deliberation, the jury returned a general verdict in favor of Bay Dray in the sum of $180,000 and a general verdict in favor of Smalley on its counterclaims in the sum of $9,414.35. Smalley thereafter moved for a judgment notwithstanding the verdict, or, in the alternative, for a new trial or a remittitur. This motion was denied. Smalley appealed.
A strong presumption of correctness attaches to a jury verdict in Alabama, if there is sufficient evidence to support the verdict. In short, the verdict must pass the "sufficiency test," which is presented by motions for directed verdict and j.n.o.v. Christiansen v. Hall, 567 So.2d 1338, 1341
(Ala. 1990); Alpine Bay Resorts, Inc. v. Wyatt,539 So.2d 160 (Ala. 1988). This presumption of correctness is further strengthened by a trial court's denial of a motion for new trial. Christiansen, 567 So.2d at 1341. Denying, or, to a more limited extent, granting, a motion for new trial is within the sound discretion of the trial court. See,Jawad v. Granade, 497 So.2d 471, 477 (Ala. 1986). This Court will not reverse a judgment based on a jury verdict on a sufficiency-of-the-evidence basis unless the evidence, when viewed in a *Page 1186 
light most favorable to the nonmovant, shows that the verdict was "plainly and palpably wrong and unjust."Christiansen, 567 So.2d at 1341.
The dispositive issue in this case is whether damages for breach of the provision requiring notice of termination of a contract are limited to profits that would have been earned during the notice period called for in the contract, or whether the damages recoverable include profits that, but for the cancellation of the contract, would have been earned beyond the period of the notice provision.
Bay Dray summarizes its argument as follows:
 "Appellee, Bay Dray, was awarded damages of $180,000 or nearly 5 years of projected net profits as calculated by Joe Lawrence, Bay Dray's Certified Public Accountant. The damages were awarded on the basis of Smalley's failure to adhere to the notice provision in the Agency Contract. There are no Alabama cases which hold that damages for breach of a notice provision of a contract are limited to those suffered during the notice period, outside of the employment contract context. Well settled law of damages holds that damages for breach of contract are those which naturally and proximately flow from the breach and are those that were reasonably contemplated by the parties at the time of contracting. It was contemplated by both Smalley and Bay Dray that should Smalley breach any provision of the contract, especially the notice provisions, the resulting damages would 1) be the total destruction of Bay Dray's business; and 2) certainly not limited to those suffered only during the notice period.
 "Evidence overwhelmingly shows that breach of the notice provisions caused the total destruction of Bay Dray's business and that Bay Dray in no way voluntarily chose to cease its business operations and made every effort possible to replace Smalley with another carrier. After many efforts to replace Smalley, Bay Dray unfortunately found that there was no carrier large or reputable enough to adequately service Bay Dray's needs.
 "The trial court did not abuse its discretion in refusing to continue the trial date nor did it abuse its discretion in allowing Joe Lawrence to testify as to the value of Bay Dray's business based upon seven years' profits. Case law uniformly has held that continuances are disfavored, and the Court has been hesitant to reverse decisions on the basis that the trial court abused its discretion in allowing or disallowing the testimony of witnesses. Additionally, ample opportunity was afforded Smalley, prior to trial, to review documents prepared by Joe Lawrence.
 "The award of damages should remain as the jury awarded in the Circuit Court, and the judgment of $180,000 should be affirmed."
Appellee's brief, pp. 19-20.
We disagree with Bay Dray's argument, except we do agree with Bay Dray that it is entitled to show the amount of profits it would have earned during the notice period had the notice provision been complied with and any other consequential loss or damage it suffered during that period because of the breach of the notice provision. We cannot agree with Bay Dray that it is entitled to show that breach of the notice provision caused a complete destruction of its business. There is no evidence that it was reasonably contemplated by either party that a breach of the notice provisions would cause such consequential loss or damage.
In Garrett v. Sun Plaza Development Co.,580 So.2d 1317 (Ala. 1991), this Court summarized the familiar principles governing the measure of damages in a breach of contract action:
 "In Alabama, the rule regrading damages for the breach of a contract has often been stated. Damages should return the injured party to the position he would have been in had the contract been fully performed. Boyett v. Oakes, 518 So.2d 37 (Ala. 1987); Trimble v. Todd, 510 So.2d 810 (Ala. 1987); Cobbs v. Fred Burgos Const. Co., 477 So.2d 335 (Ala. 1985). These damages are generally those that flow naturally from the breach. Hutchinson v. South Montgomery *Page 1187 Academy, 535 So.2d 189 (Ala.Civ.App. 1988); Chastain v. Baldwin Mut. Ins. Co., 495 So.2d 684 (Ala.Civ.App. 1986). However, the injured party is not to be put in a better position by a recovery of damages for the breach than he would have been in if there had been performance. Curacare, Inc. v. Pollack, 501 So.2d 470 (Ala.Civ.App), writ quashed, 501 So.2d 472 (Ala. 1986)."
580 So.2d at 1320. (Emphasis added.)
The courts of Alabama have addressed the issue presented in this case in the context of employment contracts. InCuracare, Inc. v. Pollack, 501 So.2d 470
(Ala.Civ.App. 1986), the Court of Civil appeals considered a one-year employment contract that contained the following provision:
 "Termination. Employment hereunder may be terminated by either party hereto with written notice to the other party two weeks prior to the effective date of termination."
501 So.2d at 471-72. The employee was given oral notification of his termination approximately four months into the one-year contract term. The trial court entered a judgment in favor of the employee and awarded damages of $8,500, an award greatly exceeding two weeks' pay. Id. at 471.
On Appeal, the Court of Civil Appeals affirmed the trial court's holding that a breach of contract had occurred because of a failure to give written notice. However, the court reversed the award of damages, holding that the trial court had erred in awarding an amount of damages exceeding two weeks of compensation:
 "In the case at bar, if Curacare had performed in accordance with the terms of the contract, it would have provided Pollack with written notice of termination, rather than oral notice. Written notice of termination would have provided Pollack two weeks' notification before his eventual termination. Written notice would have constituted perfect performance under the terms of the contract between the parties. Thus, any [damages awarded] to Pollack in excess of two weeks' compensation, $562.50, is excessive."
501 So.2d at 472.
In Burch v. Lake Forest Property Owners Ass'n, Inc.,565 So.2d 611 (Ala. 1990), the plaintiff had a two-year contract with the defendant Association to be the Association's general manager and golf professional. In the contract, the Association reserved the right to terminate the plaintiff's employment at any time and for any reason, with 45 days' written notice. Id. at 612. The plaintiff was terminated without being given the required notice. The Association, recognizing that the notice provisions had been violated, paid the plaintiff all wages and benefits for the 45 days he would have worked if the contract had been complied with. Id. at 612. The plaintiff claimed, however, that he was entitled to payment for the entire contract period because of the breach. The trial court entered a summary judgment for the Association, and this Court affirmed, following Curacare and stating:
 "If the Association had fully performed the provision of the contract, Burch would have received compensation for 45 days as well as all of the privileges afforded the general manager and golf pro of the Association. All of these things were given to him, despite the fact that he was not allowed to 'remain on the job' for those 45 days.
 " 'The summary discharge of any employee entitled under the employment contract to a specified period of notice ordinarily permits him to recover his compensation for the notice period only and not for the entire balance of the contract period.'
 "Annot., 96 A.L.R.2d 272, 277 (1964). We conclude that the violation of the notice provision does not entitle Burch to compensation for the entire contract period. Because the Association had already compensated him for the notice period provided in the contract, summary judgment was proper."
565 So.2d at 612; see also Zippy Mart v. A B CoffeeService, Inc., 380 So.2d 833 (Ala. 1980) (costs incurred by vendor in reliance *Page 1188 
on 18-month contract to provide coffee for sale in Zippy Mart convenience stores was improper measure of damages for wrongful termination after 12 months; the only damage or loss flowing from the breach was loss of anticipated profits from sale of coffee and supplies during remaining six months).
The Curacare and Burch decisions follow the majority rule in this country that damages for a breach of a "notice of cancellation" provision in a contract are limited to the profits or other earnings that were lost during the notice period. See 25 C.J.S. Damages § 74, at 853 (1966) ("Where a contract is terminable at any time on notice and it is terminated without notice, the damages which the aggrieved party may recover are limited to the notice period"); 25 C.J.S.Damages § 90, at 978 (1966) ("Where a contract provides for its termination by either party on notice of a specified number of days, profits may be recovered for only that length of time"). As recognized by Curacare andBurch, any other measure would place the injured party in a better position by recovery of damages than he would have been in if there had been perfect performance under the notice provisions.
The rule limiting damages to the notice period has been adopted and followed in cases involving a wide variety of commercial transactions outside the employment context, including agency/franchise agreements similar to the Smalley-Bay Dray contracts in this case.[3] This rule has been applied where the improper termination causes the plaintiff to lose his business altogether. See Mark Seitman Assocs., Inc. v. R.J. Reynolds Tobacco Co.,837 F.2d 1527 (11th Cir. 1988); James v. Dayton Rubber Mfg.Co., 57 Ga. App. 511, 196 S.E. 298 (1938) (distributor's agreement requiring 30 days' notice of termination; damages limited to probable profits lost within 30 days).
In Seitman, the defendant, R.J. Reynolds Tobacco Company, agreed to sponsor a weekly sports tabloid that Seitman would publish during the football and basketball seasons. R.J. Reynolds was the exclusive advertiser in the tabloid. Seitman was to publish 25 issues per year during the publishing cycle, running from September through March. The contract had a five-year term, commencing in July 1982, but it could be terminated by the defendant's giving written notice on or before March 1 of any contract year. 837 F.2d at 1529.
In December 1984, midway through the 1984-85 publishing cycle and halfway through the five-year term, the defendant terminated the contract. Seitman sued, claiming, inter alia, the loss of its entire business and seeking to recover the value of its business. At trial, the district court charged the jury that if it found the defendant had failed to exercise good faith in performing its obligations under the contract and that its failure deprived the plaintiff of an opportunity to sell its publishing business to another as a going concern, then the jury could award as damages the value of the publishing business as a going concern at the time the contract was terminated. Id. at 1532 n. 5. The plaintiff recovered a judgment for $1.8 million. Id. at 1529.
On appeal, the Court of Appeals for the Eleventh Circuit held, as a matter of law, that the district court had erred in instructing the jury that it could award damages for the value of the plaintiff's business. Id. at 1532. The Court held that because *Page 1189 
the defendant had a right to terminate the contract with respect to future publishing cycles by giving notice before March 1, 1985, the defendant could, at most, be liable for the profits lost by the plaintiff over the remainder of the 1984-85 publishing cycle, plus close-down costs. Id. The court of appeals directed the district court to amend the judgment by subtracting that portion of the verdict allocable to business value, leaving intact that portion allocable to lost profits and close-down costs. Id.
In the present case, Smalley had the unqualified right to cancel the contractor operating agreement at any time on 10 days' notice and the agency agreement on 30 days' notice.[4]
Given the options available to owner/operators in the use of their trucks, as evidenced by the facts of this case, we cannot hold that it was reasonably contemplated by the parties to this, or any other standard trucking agency relationship, that the operator's business would be lost or destroyed if the contracting party failed to give the required notice.
There was no evidence that Smalley, when it entered into the contracts with Bay Dray, was informed that some peculiar circumstances would prevent Bay Dray from surviving financially long enough to locate another operating authority if less than 10 days' notice of cancellation were given. This is evidenced by the contractual relationship of the parties. The agency agreement provided for reimbursement of 85% of all revenues generated in a particular week by the issuance of a check one week later. Thus, revenues generated from Thursday midnight, December 6, through Thursday midnight, December 13, were reimbursed by a check issued December 20 and received December 21. A final check, which would have been issued December 27, reflecting revenues that were generated after December 13, i.e., amounts that had not been entered into the computer prior to Thursday midnight, December 13, was withheld from Bay Dray together with $2,000, which had been paid into an escrow fund required under the contractor operating agreement.[5]
Consequently, termination of the Smalley contracts did not affect Bay Dray's cash flow until December 28, when a commission check for the pay period of December 13-20 would otherwise have been received and negotiated. Thus, given that cash flow would not be immediately terminated, but would in fact continue for at least a week, it was simply not foreseeable that a 3-day rather than a 10-day notice of cancellation would cause Bay Dray to fold under the pressure of creditors before another agency could be located.
In Alabama, damages for the breach of a contract are limited to those that may reasonably be supposed to have been within the contemplation of the parties when the contract was made.Aldridge v. Dolbeer, 567 So.2d 1267, 1269-70 (Ala. 1990). Applying this foreseeability principle in an analogous context, this Court has held that only nominal damages can be recovered for the breach of a contract to lend money, unless the lender was informed at the time of the contract of the borrower's inability to borrow elsewhere. Williams v.Citizens Bank of Guntersville, 350 So.2d 1031, 1033 (Ala. 1977). Operating authority, like a bank loan, is presumptively available from numerous sources. A bank that breaches a promise to lend money is not held to foresee, and *Page 1190 
bear the consequences of, the borrower's inability to borrow elsewhere. Nor should Smalley be held responsible for Bay Dray's inability to find another acceptable and available carrier in the area.
Nothing in the record suggests that, at the time of contracting, Smalley was aware of any unique or exclusive suitability of its company for Bay Dray's purposes. Even assuming, arguendo, such an awareness, i.e., knowledge that, in the event of termination, no other company in the region would be available and/or large enough to handle Bay Dray's business, then the loss of Bay Dray's business would, under those circumstances, be a foreseeable consequence of any
termination, with or without notice, not a consequence of less notice than the contract specified. Such consequences would flow from the permitted termination, not from a breach of the notice provisions.
In its brief, Bay Dray has definitively demonstrated Smalley's position on this appeal. Bay Dray describes at length its consideration of various options to stay in business and concludes that Bay Dray was shut down "because there was no viable, reputable, nor established regulated carrier in the area that was big enough to service Bay Dray's financial needs and/or who had the contractual freedom to do so." (Appellee's Brief, p. 11). Bay Dray states in its brief:
 "All other available regulated carriers were considered, and it was decided that no available regulated carriers could finance the volume of business Bay Dray was generating and/or there was none who could offer the broad based licensing authority Bay Dray needed to haul all types of freight.
 ". . . Bay Dray determined that trying to stay in business by signing with several small regulated carriers such as Laidlaw and/or Dynasty would not produce enough cash flow to allow Bay Dray to survive."
(Appellee's Brief, pp. 34-35.)
We have reviewed the evidence and have considered the argument made by Bay Dray, and we find that there was no evidence that there existed any regulated carrier or other option that would have made a difference and would have saved the company if 10 days' notice had been given. To the contrary, Bay Dray's argument, and its evidence in support thereof, demonstrate that the lack of proper notice was not the proximate cause of Bay Dray's cessation of business. Instead, Bay Dray's account of the situation demonstrates that it shut down because Smalley had decided to terminate the contracts. Three days', ten days', or thirty days' notice would have made no difference. According to Bay Dray, there was no other acceptable alternative in the Mobile region for the continued operation of its business and it, therefore, ceased doing business.
The evidence in this case shows that Smalley gave three days', rather than ten days', notice of termination of the contractor operating agreement. In ruling that it was appropriate for the jury to consider and award damages equivalent to seven years of anticipated lost profits based on Smalley's failure to give seven additional days' notice, the trial court ignored fundamental principles of contract law as well as Alabama case law.
"Damages recoverable for a breach of contract are those which arise naturally and normally from the breach of contract and those which the parties should have contemplated, when the contract was made, as a probable result of a breach." Gamble,Alabama Law of Damages (2d ed. 1988), § 2-4. In the context of this contract, we hold that the damages recoverable include the loss of profits that would have been earned during the notice period had the notice provision been complied with and an amount to compensate for any consequential damage or loss that may have resulted during the notice period as a proximate result of the breach and that Smalley had reason to foresee — at the time thecontract was made — as a probable result of the breach. For example, Bay Dray may be able to show that it lost a perishable cargo because of the premature termination, or that it incurred other shutdown costs that it would not have incurred had the notice required under the contract been given. If Bay Dray can prove such consequential *Page 1191 
loss or damage, then it could recover for it.
We hold, however, that the natural, proximate, and foreseeable consequence of a failure to give the full 10 days' notice required under the contractor operating agreement does not include the loss of any profits or other loss or damage suffered beyond the notice period. An award of such damages would place Bay Dray in a better position than would perfect performance, because perfect performance notice would have cut off the right to earn further profits after 10 days.
Therefore, we hold that the trial court erred in allowing the plaintiff to show that it incurred loss or damage beyond the termination notice period. The judgment of the trial court is due to be reversed and the cause remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
ALMON, SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] Under the Interstate Commerce Act, a motor carrier must receive operating authority from the Interstate Commerce Commission before engaging in most forms of interstate motor transportation for hire.
[2] Because of the smaller size of their operations, truck owners/operators such as Bay Dray often do not seek their own operating authority, but rather will lease their equipment and services to a regulated carrier such as Hall Systems or Smalley, transporting goods under that regulated carrier's operating authority. Such leasing arrangements are highly regulated by the Commission. See 49 C.F.R. § 1057.1 to .42 (1991).
[3] See, e.g., Western Oil Fuel Co. v. Kemp,245 F.2d 633 (8th Cir. 1957) (contract to purchase fuel requirements from plaintiff); Chevrolet Motor Co. v.McCullough Motor Co., 6 F.2d 212 (9th Cir. 1925) (exclusive dealership contract for sale of Chevrolet automobiles); Reliable Tire Distributors v. KellySpringfield Tire Co., 607 F. Supp. 361 (E.D.Pa. 1985) (tire distributorship agreement); Martin v. U-Haul Co. ofFresno, 204 Cal.App.3d 396, 251 Cal.Rptr. 17 (1988) (dealership contract for U-Haul vehicles/equipment); DenverPublishing Co. v. Kirk, 729 P.2d 1004 (Colo.App. 1986) (contract for sale of used cardboard); Chrysler Corp. v.Quimby, 51 Del. 264, 144 A.2d 885 (1958) (dealership contract for sale of Chrysler automobiles); MississippiPower Co. v. Cochran, 167 Miss. 705, 147 So. 473 (1933) (contract to supply electricity); Fife v. Great Atlantic Pacific Tea Co., 166 Pa. Super. 77, 70 A.2d 369 (1950) (trucker's contract to haul defendant's merchandise from warehouses to retail stores); Freiburger v. Texas Co.,216 Wis. 546, 257 N.W. 592 (1934) (service station agency contract).
[4] The testimony was uncontradicted that the contractor operating agreement provided the operating authority and the insurance necessary for the plaintiff to have its trucks on the road. The agency agreement set forth the respective duties of the parties relative to transportation expenses and allocated revenues generated. Without operating authority and insurance, however, no revenue would have been generated and the agency agreement would have no utility. Bay Dray does not dispute the point that without the operating agreement, the plaintiff could not have operated its trucks as Smalley's agent and, thus, that proper cancellation of the operating agreement on 10 days' notice, in and of itself, would cancel the parties' ongoing relationship. Thirty days' notice would have afforded no further advantage to the plaintiff after the contractor operating agreement was canceled.
[5] At trial, Smalley established debts owing from Bay Dray in excess of the funds withheld, particularly $7,373.37 on trailer leases, $3,614.35 on per diem charges, and $5,800 on the value of a lost chassis. The jury's verdict of $9,414.35 on these counterclaims was also in excess of the amount withheld.