**Scott GREENSTREET and Christine Greenstreet, Plaintiffs–Respondents,**

**v.**

**Shirley A. FAIRCHILD, and Claude F. Fairchild, Defendants–Appellants.**

**No. SD 29787.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 28, 2010.

Kendall R. Vickers and Howard C. Gosness, The Vickers Law Firm, Nevada, MO, for Appellants.

Mercedes Watson, Watson Law Firm, Stockton, MO, for Respondents.

GARY W. LYNCH, Presiding Judge.

Claude and Shirley Fairchild (collectively, "Sellers," and individually, "Claude" or "Shirley")[1] appeal the judgment of the Circuit Court of Cedar County, Missouri, granting rescission of a contract for deed ("the Contract") and damages to Scott and Christine Greenstreet (collectively, "Buyers," and individually, "Scott" or "Christine") based upon breach of contract, constructive eviction, and trespass. Sellers

---

1. Because of the same last name, we use first names for clarity. No disrespect is intended.

make three claims on appeal: that rescission was in error because Sellers' breach of the Contract was not material; that a finding of constructive eviction was in error because Buyers had equitable title to the property in question; and that restitution of Buyers' $60,000.00 down payment was in error because Buyers did not tender the value of all benefits conferred upon them under the Contract. Finding no merit in any of these arguments, we affirm the trial court's judgment.

### Factual and Procedural Background

We view all evidence and inferences in the light most favorable to the trial court's judgment and disregard all contrary evidence and inferences. *Payroll Advance, Inc. v. Yates,* 270 S.W.3d 428, 431 (Mo. App.2008). Furthermore, neither party requested that the trial court make written findings of fact and conclusions of law; in a court-tried case, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c).[2] In that light, the following was adduced at trial.

In October 2006, Buyers came to Missouri from their home in Kodiak Island, Alaska, for a "mini[–]family reunion." On that trip, the family visited with Sellers, whose house in El Dorado Springs was for sale. Scott had worked for Sellers on their dairy farm when he was a boy. Buyers were "looking for a place to retire" and raise their children. After looking at Sellers' property, Buyers "fell in love with it," because it was in the country, there were forty acres of land so the family could have animals, and it was a completely different lifestyle than they had in Alaska. According to Buyers, the house was the "fulfillment of a dream." At the time, Buyers "really liked" Sellers; Christine thought

that "[t]hey made you feel right at home and . . . were just very nice people[.]"

The house is divided into two living spaces, the upstairs and the basement. The upstairs level has three bedrooms, two-and-a-half bathrooms, a living room, a dining room, and a kitchen. Off of the kitchen is a set of stairs, at the bottom of which is a door leading into the basement. The basement is mostly finished, with a kitchen, a living room, a bedroom, a full bathroom, and an unfinished area with the water heater. The basement also has a separate entrance. The house, including the basement, has approximately 5,000 square feet and is situated on forty acres of land.

When Buyers initially expressed interest in the property, Sellers had the property listed with a real estate agent. Sellers told Buyers that they wanted to wait until the listing expired, at which time they would sell the house and acreage to Buyers for $300,000.00.

The following March, Buyers again visited El Dorado Springs and this time stayed in the "upstairs house" on the property. Sellers mainly resided in the basement portion of the home. Sellers' real estate listing had expired, and Shirley informed Buyers that the price on the property was $300,000.00, which would include any furnishings Buyers wanted from the upstairs level of the home, plus some farm equipment. During that visit the parties verbally agreed to a purchase price of $300,000.00, but no down payment was made at that time. Also during that visit, Buyers reached an agreement with Claude, wherein Buyers purchased some cattle and Claude agreed to take care of them while Buyers returned to Alaska. This included having part of the forty acres fertilized. Buyers also purchased

2. All rule references are to Missouri Court Rules (2009).

two air purifiers for the home because their daughter is asthmatic and was bothered by Shirley smoking inside the house.

In early May 2007, Buyers sent a check for $30,000.00 to Sellers to show that they were serious about buying the house and accompanying acreage. Sellers deposited that check on May 5.

Christine and her two daughters moved from Alaska on May 28, 2007, and Sellers picked them up from the airport in Kansas City. Buyers immediately moved into the upstairs level of Sellers' home. Shortly thereafter, in early June, Buyers and Sellers met with attorney Dennis Reaves to draw up a written contract for the sale of the property. At that time, Sellers changed the purchase price of the property to $320,000.00.

Shortly after moving into the house, the parties began having problems. Initially, the parties disagreed over the location of an above-ground swimming pool, which was paid for by Buyers. While Sellers did not contest the pool's existence, they disagreed with Buyers about the location of the pool, and ultimately Buyers changed the location of the pool to appease Sellers.

The parties differed, as well, regarding the temperature at which the thermostat was set. A single thermostat, located on the upstairs level of the home, controlled the temperature for the entire house. After Buyers set the thermostat upon moving into the home, Shirley instructed Buyers to set the temperature at 72 degrees. They acquiesced and never again changed the setting on the thermostat.

The parties also disagreed over Sellers keeping a loaded gun in plain sight in the basement. Christine repeatedly told Shirley that she was uncomfortable having a loaded gun visible and available to her children—then ages thirteen and seven—and asked Shirley to "put it away." Shirley told Christine that "it was her right to have the gun sitting on the table. And . . . she had put her hand on the gun and she told me that [it] was to take care of problems." Christine felt threatened by Shirley's response.

In late June, Buyers' oldest daughter hurt her ankle. While doing some work in the basement—she often did chores for Sellers—she complained that her ankle hurt, and Shirley gave her two bottles of pills. Buyers' daughter took the bottles to her mother, who was disturbed to find that they were labeled "Hydrocodone" and "Sulfa Trim." When Christine confronted Shirley about the pills, Shirley simply replied that "[the girl] was in pain and that these would help." Christine asked Shirley not to give anything to her children without express permission.

Finally, on one occasion also that June, Buyers returned home from the grocery store to a strong smell of cigarette smoke in the upstairs level of the house and cigarette ashes on the kitchen floor. Papers in the desk area were moved around and re-ordered. When Christine asked Sellers why they were upstairs, Shirley replied that "somebody had rang [sic] the doorbell upstairs and she needed to see who was at the front door." Buyers had purchased a separate doorbell for the upstairs level of the home and placed a sign stating "[Sellers] live downstairs. [Buyers] live upstairs." At that time, Sellers agreed that they would not go upstairs without express permission from Buyers. Following this incident, Buyers installed a locking mechanism on the basement door; before this, there had been only a deadbolt that locked solely from Sellers' side. Buyers also changed some of the other upstairs locks.

Twice in early July, Buyers went to the basement to try and resolve their issues with Sellers. Things seemed better after

these meetings, so on July 5, 2007, the parties signed the Contract as drafted by attorney Reaves. Under the terms of the Contract, Buyers were to pay $60,000.00 down plus $1,300.00 per month until the purchase price—including 6% interest—was completely paid. At that time, according to the Contract, Sellers would deed the property to Buyers. Buyers paid a second $30,000.00 payment and the first $1,300.00 monthly payment when they signed the Contract. Additionally, Buyers were to pay for half of the utilities for the property, which they did for the months of June and July. The Contract also provided that Sellers would remain living in the basement portion of the house while Buyers would take possession of the upstairs level. Sellers had the right, pursuant to the Contract, to inspect the upstairs level of the home "with reasonable notice to [Buyers] and at reasonable hours." Upon Buyers paying the remainder of the purchase price, Sellers would have 90 days to vacate the home. The parties agreed in the Contract that the $320,000.00 purchase price was allocated $280,000.00 to the house and $40,000.00 to the land.

Seventeen days later, on July 22, 2007, Buyers went for a drive to Osceola, Missouri. When they returned to the house, they could smell cigarette smoke upstairs, and they noticed that the lock mechanism on the basement door had been removed. Buyers also noticed that someone had tried to unlock one of the new locks upstairs with a different key, which had broken off in the lock. Another door upstairs, however, had been successfully unlocked and provided entry into the upstairs level of the home; it was later determined that Sellers had retained a key to the upstairs level of the house without informing Buyers. Once again, Buyers' papers on the desk, consisting of financial statements, a job application for Christine along with her criminal background check and letters of reference, and identifying paperwork for the children, had been disturbed. Finally, a security-camera screen, located in one of the children's bedrooms, had been moved.

Buyers called 911. While they were waiting for the sheriff to arrive, Claude came through the garage and "banged on the door that leads into the house[.]" He was very upset and began yelling at Buyers saying, "You did a stupid thing, boy. You locked the doors. You changed locks on my house." Claude came up the stairs and tried to physically confront Scott. Claude continued to tell Buyers that "[they] didn't have any right to change the locks on [his] house" and that they were "stupid" for doing so. Scott asked Claude if he had read the Contract, to which Claude responded that he had not, but that "Shirley told him that it was their house." Claude told Christine "that, if [she] wasn't a whiney bitch, that none of this [would] have happened, that [she] was just a whiney cry'ie bitch. And that [she] needed to learn." Claude then told Scott "that Shirley is ... controlling and that [Buyers] just needed to learn how to deal with her at that time." Claude went on to threaten to poison Buyers' "stupid cows[.]" Scott told Claude to "just calm down" because they had called the sheriff. Although Claude remained upstairs for a little while afterward—all the while talking about how Christine was a "whiney bitch" and how she "just needed to learn to get along with Shirley"—he had gone back down to the basement by the time the sheriff arrived.

Buyers told the sheriff about the intrusion into their home, as well as the altercation with Claude. The sheriff examined the broken locks and disordered paperwork and then went downstairs to speak with Sellers. While the sheriff was in the basement, Sellers turned off the electricity to the upstairs level of the house. When the sheriff returned upstairs, Buyers in-

formed him of the power situation, at which point he returned to the basement. Sellers insisted that something was wrong with the air conditioner, but, nevertheless, they turned the power back on. Shortly after the sheriff's departure, Sellers again turned off the power to the upstairs and also shut off the water. Buyers again called the sheriff, who returned to the home.

Because of the threat to Buyers' animals, the family called Healey's Livestock Auction to come and remove the animals from the property; because of the repeated actions turning off the power to the upstairs, Buyers were fearful of remaining in the home and instead spent that night in a hotel. Buyers moved out the next day.

Sellers claimed that they entered the upstairs level of the home that day because the thermostat was set too low and they were cold. Claude stated that when he and his wife discovered that the door from their basement apartment to the upstairs area had been locked, they "pulled the pins in the door," went upstairs, readjusted the thermostat, and then returned to the basement. He denied attempting to gain access to the upstairs level any other way. Shirley, however, admitted to attempting to enter the upstairs level through a patio door, but her key broke off inside the lock. Sellers had never complained about the temperature of the home prior to that occasion. Sellers did not call Buyers prior to entering the upstairs that day. Claude denied threatening Buyers or their animals. He admitted turning off the electricity to the upstairs level of the house "[b]ecause of their harassment." Shirley claimed they shut off the electricity because the air conditioner had been running too long and was damaging the compressor, and she could not get a repairman out until the next day.

Buyers filed a petition against Sellers on October 9, 2007, alleging breach of contract (Count II), breach of implied warranty of peaceful use and enjoyment (Count III), constructive eviction (Count IV), slander (second Count IV), invasion of privacy (Count V), and trespass (Count VI). Buyers asked the trial court to award restitution and punitive damages. Following Buyers' filing of a motion for default judgment, Sellers filed an answer on March 17, 2008, denying all counts alleged in the petition. No affirmative defenses or counterclaims were asserted.

Following a bench trial on February 25, 2009, during which Buyers abandoned their claim for slander (second Count IV), the trial court, on March 23, 2009, entered judgment for Buyers. Specifically, the trial court found that Sellers materially breached the Contract and that the actions taken by Sellers were unreasonable and resulted in the constructive eviction of Buyers from the property. Accordingly, the trial court entered judgment against Sellers for breach of contract (Count II), constructive eviction (Count IV), and trespass (Count VI). The trial court awarded Buyers judgment against Sellers in the amount of $66,021.91, which included the return of Buyers' down payment, their attorney fees, and other expenses incurred; it reduced the total damages in the interest of equity, however, taking into account a fair rental value of the property during the time Buyers resided in the upstairs level of Sellers' house.

This appeal by Sellers timely followed.

### Standard of Review

In a court-tried case for breach of contract, we will affirm the judgment of the trial court "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Mihlfeld &*

*Assocs., Inc. v. Bishop & Bishop, L.L.C.,* 295 S.W.3d 163, 170 (Mo.App.2009) (citing *Jamison v. State of Mo., Dept. of Social Servs.,* 218 S.W.3d 399, 404 (Mo. banc 2007); *Citizens Nat'l Bank v. Maries County Bank,* 244 S.W.3d 266, 270 (Mo. App.2008)). Since neither party requested findings of fact or conclusions of law, we view all factual issues as in accordance with the judgment of the trial court. Rule 73.01; *Haynes v. Almuttar,* 25 S.W.3d 667, 671 (Mo.App.2000). We defer to the trial court's determinations regarding credibility; however, we review issues of law *de novo. Tolliver v. Dir. of Revenue,* 117 S.W.3d 191, 196 (Mo.App.2003).

### Discussion

Sellers present three points for our review. We address them in the order presented.

### Rescission

■ In their first point relied on, Sellers allege that

> [t]he trial court erred in ordering rescission of the parties' contract because the alleged breach of the contract was not material in that it concerned the occupancy of the residence, which was a subordinate provision that did not go to the root of the contract, which was the sale of the real estate.

■ If one party to a contract materially breaches that contract, the aggrieved party may cancel the contract and be relieved of its obligation under the contract. *Curt Ogden Equip. Co. v. Murphy Leasing Co., Inc.,* 895 S.W.2d 604, 609 (Mo.App. 1995). "A material breach is one where the breach relates to a vital provision (i.e., material term) of the agreement and cannot relate simply to a subordinate or incidental matter." *Spencer Reed Group, Inc. v. Pickett,* 163 S.W.3d 570, 573–74 (Mo. App.2005) (citing *Patel v. Pate,* 128 S.W.3d 873, 878 (Mo.App.2004)). "Whether a breach of contract is material is a question of fact." *Fire Sprinklers, Inc. v. Icon Contracting, Inc.,* 279 S.W.3d 230, 233 (Mo.App.2009) (citing *Curt Ogden Equip. Co.,* 895 S.W.2d at 608–09).

Sellers do not dispute that their conduct on July 22, 2007, breached Buyers' right under the Contract to possession of the upstairs level of the residence, but rather, challenge the trial court's factual determination that the breach was material to the Contract because, according to Sellers, "the principal purpose of the Contract was the sale to [Buyers] of a forty-acre tract of land." Although not explicitly stated in their point, apparently Sellers claim that the materiality factual finding by the trial court is not supported by substantial evidence. We disagree.

■ There are five significant factors in determining whether a breach is material: "(1) the extent to which the injured party will be deprived of a reasonably expected benefit[;] (2) the extent to which the injured party can be compensated for the part of that deprived benefit[;] (3) the extent to which the party failing to perform will suffer forfeiture[;] (4) the likelihood that the party failing to perform will cure that failure[;] and (5) the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing." *McKnight v. Midwest Eye Inst. of Kansas City, Inc.,* 799 S.W.2d 909, 915 (Mo.App.1990) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 241 (1981); *Stokes v. Enmark Collaborative,* 634 S.W.2d 571, 573[1–4] (Mo.App.1982)). Substantial evidence supported each of these factors favoring the trial court's materiality finding.

In addressing the first factor—the extent to which Buyers will be deprived of a reasonably expected benefit—we initially note that the Contract specifically provides

that "[Sellers] shall deliver possession of the upstairs of the residence and the land to [Buyers] upon execution of this contract." Sellers do not argue or contend that Buyers were anything other than reasonable in expecting that their possession of the upstairs of the residence and the land would be peaceful and free of interference by Sellers. The thrust of Sellers' argument, as related to this factor, rather, is that the Sellers' breach of Buyers' possession on July 22, 2007, was not an extensive enough deprivation of that right to be material. Had that breach happened in isolation, perhaps Sellers' argument would have some merit. When considered in the light of the totality of the surrounding circumstances, however, there was substantial evidence supporting that Sellers' interference with Buyers' possession would extend to the entire term of the Contract, which, assuming no pre-payments by Buyers, would have been over eleven years.[3]

Although Sellers' breach of the Contract occurred on July 22, 2007—a contract cannot be breached if it does not yet exist—as the trial court pointed out, Sellers' actions before the parties signed the Contract "affected [Buyers'] states of mind and enhanced the seriousness of [Sellers'] later conduct." In regard to the latter, their prior conduct was also an indication of the extent to which Sellers' intended to engage in a continuing course of interference with Buyers' possession.

In this context, it is clear that this factor supports the trial court's finding of a material breach of the Contract. Buyers were deprived of their expectation of privacy in their home, as well as their use and enjoyment of the property, by Sellers' actions during the approximate two-month period Buyers lived in the house. These infringements were a direct result of the Sellers remaining in the basement level of what had been their home for nearly forty years. Moreover, Buyers repeatedly tried to work out their differences with Sellers, only to have conditions sour time and again; indeed, it was only after the Sellers' indication that they could and would change their behavior that Buyers were persuaded to enter into the Contract, even after repeated interferences had already occurred. After the events constituting the breach of the Contract on July 22, 2007, only seventeen days after the Contract was signed, it became clear that Sellers' behavior had not changed over the course of Buyers' occupancy of the property and, indeed, would not change over the term of the Contract.

The evidence related to the second factor—the extent to which Buyers can be compensated for part of that deprived benefit—also supports the trial court's finding of materiality. The bulk of the purchase price was allocated to the residence and, consequently, to Buyer's right to peaceably possess it and live there. Living in the residence in conjunction with the acreage and the family activities on that acreage was the attraction and allure of the property to Buyers in the first instance. Monetary damages would not adequately compensate Buyers for their inability to enjoy the possession of their home for the remaining term of the Contract, which could be over eleven years. Likewise, injunctive relief is not an adequate remedy to allay the natural anxiety arising from continuing hostilities between two unrelated families living in the same residence for such a lengthy period of time.

Sellers do not demonstrate or argue in any manner that the third factor—the extent to which Sellers will suffer forfeiture—supports their position. The trial

---

3. After applying the $60,000.00 down payment to the purchase price, the payment of the remaining balance of $260,000.00 at 6% interest would require 138 monthly payments of $1,300.00.

court's judgment essentially restores them to their status quo as owners of the property having been paid a reasonable rent for the less than two months Buyers resided in the upstairs of the residence.

The evidence supporting both the fourth factor—the likelihood that Sellers will cure that failure—and the fifth factor—the extent to which the behavior of Sellers comports with standards of good faith and fair dealing—is interrelated with that supporting the first factor. Sellers' actions, beginning from the time that Buyers moved into the upstairs of the residence until they left the residence after the events of July 22, 2007, coupled with Sellers' repeated false assurances that they would cease interfering with Buyers' possession of the premises, support a determination that little likelihood existed that Sellers would change their behavior or that they would start dealing fairly and in good faith with Buyers. The evidence supports just the opposite—Sellers' interference with Buyers possession would likely only increase and escalate in the future, just as it had in the past. As such, both of these factors favor the trial court's determination that Sellers' breach of the Contract on July 22, 2007, was a material breach.

Finding that substantial evidence supports all five factors in favor of the materiality of Sellers' breach of the Contract, the trial court did not err in ordering rescission of the Contract for such breach. Sellers' first point is denied.

### Constructive Eviction

Next, Sellers contend that "[t]he trial court erred in finding that [Sellers] constructively evicted [Buyers] because [Sellers] did not have paramount title to the property, in that they had contracted to sell the property to [Buyers] and accordingly, [Sellers] had conveyed equitable title to the property to [Buyers]." This point affords Sellers no relief.

This point presupposes that Sellers' actions on July 22, 2007, were not a material breach of the Contract, as alleged in Sellers' first point, and that, in addition, such actions were not a constructive eviction either. As previously discussed, Sellers' actions on that date were a material breach of the Contract supporting rescission under Count II of Buyers' petition for breach of contract. This is so under the terms of the Contract regardless of the legal or equitable ownership of the property and regardless of whether or not the trial court gratuitously found that such actions also constituted a constructive eviction under Count IV of the petition or otherwise denominated such actions as a constructive eviction. Sellers do not argue otherwise. For this reason, we need not further address this point. Sellers' second point is denied.

### Restitution

■ Finally, Sellers argue that "[t]he trial court erred in awarding restitution of the down payment to [Buyers] because they did not plead and prove that they tendered or offered to credit all benefits conferred to them under the Contract." This point is defective and does not preserve anything for appellate review.

This point does not comply with Rule 84.04(d)(1)(C), which requires that a point relied on, in addition to stating the legal reasons for the claim of error, shall "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1)(C). Unfortunately, Sellers' argument under this point provides no illumination in this context. After stating in their argument the conclusion that "[Buyers] neither tendered nor offered to tender the benefits conferred on them during their possession of the property, nor did they prove that they were excused from

doing so[,]" the Sellers assert that "[i]t is not [Sellers'] or this Court's role to identify the benefits [Buyers] received, or the basis for their claim of an excuse from doing so." Consistent with this statement, Sellers did not identify anywhere in their brief any benefits received by Buyers, which Sellers claimed should have been pleaded and proved by Buyers.

The trial court's judgment is presumed correct. *Dills v. Dills,* 304 S.W.3d 738, 741 (Mo.App.2010) (quoting *GMAC v. Crawford,* 58 S.W.3d 529, 532 (Mo.App. 2001)). Sellers, as appellants, bear the burden of proving their claims of error. *Reliable Roofing, LLC v. Jones,* 302 S.W.3d 232, 236 (Mo.App.2009) (citing *Ray Klein, Inc. v. Kerr,* 272 S.W.3d 896, 898 (Mo.App.2008)). As such, and in compliance with Rule 84.04(d)(1)(C), it was incumbent upon them in this point to support their legal reason for claimed error by identifying, in the context of this case, the alleged benefits received by Buyers, which Sellers now claim Buyers should have pleaded and proved. Apparently, they intentionally chose not to do so. "An allegation of error that is not properly briefed cannot be considered in a civil appeal." *Reliable Roofing, LLC,* 302 S.W.3d at 236; Rule 84.13(a). Seller's third point is denied.

### Decision

The trial court's judgment is affirmed.[4]

BARNEY, J., and BURRELL, J., concur.

---

4.  Buyers filed in this Court a motion for attorney fees on appeal premised upon the attorney fee provision in the Contract. The Contract, however, was rescinded, and no award for attorney fees can be made in reliance on a contract which no longer exists. *Harris v. Desisto,* 932 S.W.2d 435, 448 (Mo.App.1996). Buyers' motion is denied.