K. ASAMOAH–BOADU, d/b/a/ Sam's
Janitorial Service, Respondent,

v.

STATE of Missouri, Office
of Administration, et
al., Appellant.

No. WD 71885.

Missouri Court of Appeals,
Western District.

Dec. 28, 2010.

Motion for Rehearing and/or Transfer
to Supreme Court March 1, 2011.

Mark E. Long, for Appellant.

David J. Moen, for Respondent.

Before Division Three: ALOK AHUJA, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

VICTOR C. HOWARD, Judge.

The State of Missouri, Office of Administration, et al. (OA) appeals the judgment of the trial court following a bench trial finding that the OA breached its contracts with K. Asamoah–Boadu d/b/a Sam's Janitorial Service and awarding damages. It contends that its termination of the contracts with Sam's Janitorial was permissible under the contracts and, thus, did not constitute a breach of the contracts. It further contends that the trial court erred in calculating the damages award. The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded with directions.

The case involves nine contracts awarded by the OA to K. Asamoah–Boadu (Sam), a United States citizen doing business as Sam's Janitorial Service, to perform janitorial services in various State of Missouri buildings. The contracts had contract periods ending at various times

between June 2007 and June 2008. They required Sam's Janitorial to "comply with all local, state, and federal laws and regulations related to the performance of the contract to the extent that the same may be applicable." The contracts also provided that the OA could cancel the contracts "[i]n the event of material breach of the contractual obligations by the contractor." Finally, the contracts contained a provision allowing the OA to terminate the contracts for any reason with thirty days notice.

To work in the state buildings, Sam's Janitorial employees had to have security authorizations and photo IDs. To obtain these for its employees, Sam's Janitorial was required to provide certain documentation to the OA. First, it provided copies of two forms of identification for the employees such as a driver's license, social security card, passport, or alien registration card (green card). Also, Sam's Janitorial was required to obtain criminal background checks from the Highway Patrol for its employees. Potential employees were routinely rejected by Sam's Janitorial if they could not provide the proper documentation. After Sam's Janitorial provided the OA with the required documents, the OA would send the information to the Capitol Police to check for outstanding warrants.

If there were no problems with the documentation or background checks, the OA would approve the employees to work in the state buildings. Occasionally, when Sam's Janitorial submitted documents for its employees, the OA would reject them or want further clarification. Some problems encountered with the documentation were names not matching from one form of ID to the next or unsigned Social Security cards. On two occasions, Sam's Janitorial submitted social security cards with the words "void" and "novelty" printed on them. Because of some of these problems, the OA asked the Capitol Police if there was a way to cross-check the documentation. As a result of this inquiry, federal and state law enforcement personnel entered the state buildings on March 6, 2007, where Sam's Janitorial employees were working and arrested or detained twenty-five of them on suspicion of having falsified documentation. That same day, the OA terminated the contracts because of alleged "violation of the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA) and INA Section 274A." The OA also debarred Sam's Janitorial from bidding on state contracts for a period of two years.[1] Of the twenty-five employees arrested, eight were charged. Four of the eight employees were eventually convicted of having forged documents that showed they could legally work in the United States.

Sam's Janitorial filed the underlying suit alleging in part breach of contract by the OA in terminating the contracts, violation of section 8.283, RSMo 2000 (repealed 2008), and unlawful executive order.[2] The

---

1. The OA extended Sam's Janitorial's debarment another year in March 2009.

2. Section 8.283 provided that any contractor determined upon reasonable evidence by the state agency to have knowingly violated the Immigration Reform and Control Act of 1986 by employing aliens unauthorized to work in the United States shall be ineligible to perform other contracts for the State of Missouri for a period of two years. On March 6, 2007, the same day that the OA terminated Sam's

Janitorial's contracts, then-Governor Blunt issued an executive order that provided, in part:

If the state determines that a current contractor employs any persons who are not eligible to work in the United States in violation of federal law, the contractor shall be in breach of contract and the state may lawfully terminate the contract and suspend or debar the contractor from doing business in the state of Missouri.

OA defended against the breach of contract action by asserting that it was entitled to terminate the contracts because Sam's Janitorial materially breached the contracts when it violated federal law. The court entered judgment in favor of Sam's Janitorial on the breach of contract claim and awarded it $151,782.67 in damages, finding that the OA "terminated [the] contracts on the unproven allegation that [Sam's Janitorial] knowingly violated any state or federal employment law." The trial court also found that the OA unlawfully debarred Sam's Janitorial and ordered it to take all necessary steps to remove the debarment. It did not award any damages for the unlawful debarment. This appeal by the OA followed.[3]

## Breach of Contract

In its first point on appeal, the OA claims that the trial court erred in finding that it breached the contracts with Sam's Janitorial when it terminated them. It asserts that it acted in accordance with the contracts, which permitted termination without notice if Sam's Janitorial was not in compliance with state or federal law. The OA further asserts that detention by the federal authorities of a number of the employees and the documents submitted by Sam's Janitorial for its employees provided a reasonable basis for the OA to conclude that Sam's Janitorial was not in compliance with state or federal law.

 In this court-tried case for breach of contract, the judgment of the trial court will be affirmed on appeal unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Green-*

*street v. Fairchild*, 313 S.W.3d 163, 168 (Mo.App. S.D.2010). The evidence and all reasonable inferences are viewed in the light most favorable to the judgment, and all contrary evidence and inferences are disregarded. *Greenstreet*, 313 S.W.3d at 164. The appellate court defers to the trial court's credibility determinations but reviews issues of law *de novo*. *Id.* at 169.

 The OA's defense in this breach of contract action was that it was entitled to terminate the contracts under the provisions of the contracts, specifically that Sam's Janitorial was to "comply with all local, state, and federal laws and regulations related to the performance of the contract to the extent that the same may be applicable" and that it could cancel the contracts "[i]n the event of material breach of the contractual obligations by the contractor." Specifically, the OA asserted that Sam's Janitorial violated 8 U.S.C. § 1324a (2005), which deals with the unlawful employment of aliens.

 If one party to a contract materially breaches the contract, the aggrieved party may cancel the contract and be relieved of its performance under the contract. *Greenstreet*, 313 S.W.3d at 169; *Fire Sprinklers, Inc. v. Icon Contracting, Inc.*, 279 S.W.3d 230, 234 (Mo.App. E.D. 2009); *Curt Ogden Equip. Co. v. Murphy Leasing Co., Inc.*, 895 S.W.2d 604, 609 (Mo.App. E.D.1995). " 'A material breach is one where the breach relates to a vital provision (i.e., material term) of the agreement and cannot relate simply to a subordinate or incidental matter.' " *Greenstreet*, 313 S.W.3d at 169 (quoting *Spencer Reed Group, Inc. v. Pickett*, 163 S.W.3d 570, 573–74 (Mo.App. W.D.2005)). Materiality is a question of fact. *Id.*; *Fire Sprin-*

---

3. In this appeal, the OA challenges only the trial court's judgment regarding the breach of contract claim and damages. It does not

appeal the part of the judgment finding that it unlawfully debarred Sam's Janitorial.

*klers, Inc.*, 279 S.W.3d at 233; *Curt Ogden Equip. Co.*, 895 S.W.2d at 609. In this case, it need not be decided whether a violation of 8 U.S.C. § 1324a constituted a material breach of the contracts because the OA failed to prove that Sam's Janitorial violated the law.

Eight U.S.C. § 1324a(a) makes it illegal for an employer to hire or continue to employ an alien knowing that he is an unauthorized alien or to hire an individual without complying with the employment verification system:

> **(a) Making employment of unauthorized aliens unlawful**
>
> **(1) In general**
>
> It is unlawful for a person or other entity—
>
> **(A)** to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to such employment, or
>
> **(B)** (i) to hire for employment in the United States an individual without complying with the requirements of subsection (b) of this section. . . .

Subsection b of the statute involving the employment verification system requires attestation by an employer on an I–9 form that it has verified that the individual is not an unauthorized alien by examining specified documents; attestation by the individual that he is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized to be hired for employment; and retention by the employer of the I–9 for a specified period of time. 8 U.S.C. § 1324a(b)(1)–(3). Regarding the employer's attestation duty, the statute provides:

> **(1) Attestation after examination of documentation**
>
> **(A) In general**
>
> The person or entity must attest, under penalty of perjury and on a form designated or established by the Attorney General by regulation, that it has verified that the individual is not an unauthorized alien by examining—
>
> **(i)** a document described in subparagraph (B), or
>
> **(ii)** a document described in subparagraph (C) and a document described in subparagraph (D).
>
> Such attestation may be manifested by either a hand-written or an electronic signature. A person or entity has complied with the requirement to this paragraph with respect to examination of a document if the document reasonably appears on its face to be genuine. If an individual provides a document or combination of documents that reasonably appears on its face to be genuine and that is sufficient to meet the requirements of the first sentence of this paragraph, nothing in this paragraph shall be construed as requiring the person or entity to solicit the production of any other document or as requiring the individual to produce such another document.

8 U.S.C. § 1324a(b)(1)(A). Subparagraph (B) lists a United State passport, a resident alien card, an alien registration card, or other document signed by the Attorney General as documents establishing both employment authorization and identity. 8 U.S.C. § 1324a(b)(1)(B). Subparagraph (C) lists a social security account number card or other documentation evidencing authorization of employment in the United States that the Attorney General finds to be acceptable as documents evidencing employment authorization. 8 U.S.C. § 1324a(b)(1)(C). Finally, subparagraph (D) lists a driver's license or similar docu-

ment or documentation of personal identity of such other type as the Attorney General finds provides a reliable means of identification as documents establishing identity. 8 U.S.C. § 1324a(b)(1)(D).

The OA argues that evidence showing that it encountered some problems with documentation submitted by Sam's Janitorial such as names not matching from one form of ID to the next, unsigned social security cards, or social security cards with the words "void" or "novelty" printed on them and that federal authorities detained several Sam's Janitorial employees provided a reasonable basis for the OA to conclude that Sam's Janitorial was not in compliance with state and federal law. This argument is, however, flawed. First, the contract provision that the OA claimed Sam's Janitorial breached required Sam's Janitorial to comply with federal and state law. To show that Sam's Janitorial breached that provision of the contract, the OA was required to show that Sam's Janitorial actually violated federal or state law not that the OA had a reasonable basis to believe that Sam's Janitorial violated the law.

Furthermore, the evidence cited by the OA did not demonstrate that Sam's Janitorial knowingly hired or continued to employ an unauthorized alien. Similarly, it was insufficient to prove that Sam's Janitorial hired individuals without complying with the employment verification system of 8 U.S.C. § 1324a(b)(1)–(3). The evidence regarding the problematic documentation was not presented in terms of whether Sam's Janitorial verified the identity and employment authorization of its employees under the employment verification system of section 1324a. Rather, the evidence was presented in terms of Sam's Janitorial obtaining security authorizations and photo IDs for its employees to work in the State buildings. To the extent that evi-

dence was offered regarding problems with certain documents of certain employees, the evidence did not prove that Sam's Janitorial failed to verify the identity and employment authorization for its employees by examining the documents specified in section 1324a. For example, evidence was presented that one employee, Armando Cabralis, had presented a social security card with the word "novelty" printed on it. However, a social security card was not the only document that may be examined to verify identity and employment authorization under section 1324a. Section 1324a sets out various documents or combinations of documents to verify that an individual is not an unauthorized alien. 8 U.S.C. § 1324a(b)(1)(B)–(D). No evidence was presented that Sam's Janitorial did not verify Mr. Cabralis's identity and employment authorization by examining other documents. And Mr. Cabralis was not one of the employees detained by federal authorities on March 6, 2007. The OA failed to prove that Sam's Janitorial violated 8 U.S.C. § 1324a justifying its termination of the contracts. The trial court, therefore, did not err in finding that the OA breached the contracts with Sam's Janitorial when it terminated them. The point is denied.

## Damages

■ In its next point, the OA contends that the trial court erred in awarding Sam's Janitorial damages for breach of contract representing lost profits of $151,782.67 that would have accrued through the ending dates of the nine contracts. It contends that damages should have been limited to those sustained during the thirty-day period following the letters of termination because the contracts were terminable without cause on thirty days written notice.

The objective in awarding damages is to make the injured party whole by placing it in the position it would have been in if the contract had been performed. *U.S. Neurosurgical, Inc. v. Midwest Div.-RMC, LLC,* 303 S.W.3d 660, 667 (Mo.App. W.D.2010). "The facts and circumstances of each case dictate which measure of damages is appropriate." *Guidry v. Charter Commc'ns, Inc.,* 269 S.W.3d 520, 532 (Mo.App. E.D.2008). "The proper measure of damages is a question of law." *Id.*

In an action for breach of contract, lost profits are recoverable where the loss is the natural and proximate result of the breach, is ascertainable with reasonable certainty, is not speculative or conjectural, and was within the contemplation of the parties when the contract was made. *Farmers' Elec. Co-op., Inc. v. Mo. Dep't of Corr.,* 59 S.W.3d 520, 522 (Mo. banc 2001). The law, however, cannot elevate the injured party to a better position than it would have been in had the contract been performed by both parties. *Guidry,* 269 S.W.3d at 533. A damages award for breach of contract will be reversed if the record shows an absence of proof of actual facts that present a basis for a rational estimate of damages without resort to speculation. *Id.*

In addition to the contract provisions permitting immediate termination for cause, each contract contained a termination clause permitting termination for any reason with thirty days notice. Specifically, the provision read:

> The Division of Purchasing and Materials Management reserves the right to terminate the contract at any time, for the convenience of the State of Missouri, without penalty or recourse, by giving written notice to the contractor at least thirty (30) calendar days prior to the effective date of such termination.

This provision limited Sam's Janitorial's lost profit damages to the thirty-day termination period. *Mach. Maint. & Equip. Co. v. Cooper Indus., Inc.,* 634 F.Supp. 367, 371 (E.D.Mo.1986); *Buckley v. Coe,* 385 S.W.2d 354, 358–59 (Mo.App.1964).[4] Under this provision of the contracts, the OA had the absolute right to end the contracts for any reason or for no reason at all. To avail itself of such cancellation privilege, however, it was required to give Sam's Janitorial thirty days notice. The OA notified Sam's Janitorial with letters dated March 6, 2007, that it was cancelling the contracts that day for cause. As discussed in point one, the OA had no cause to terminate the contracts that day. The OA's March 6, 2007 letters did, however, provide effective written notice to Sam's Janitorial that the contracts were terminated, albeit without the required notice. Thus, Sam's Janitorial was entitled to recover damages naturally or proximately resulting from the breach, which under the facts of the case was not the termination itself but rather the failure to provide thirty-days notice required by the terms of the contracts. *See Machine Maint. & Equip. Co.,* 634 F.Supp. at 371. The lost profit damages should have been limited, therefore, to the contractual notice period of thirty days. *Id.; Buckley,* 385 S.W.2d at 359. Because the contracts contained the notice of cancellation provision, the parties simply did not contemplate lost profits damages exceeding thirty days. Awarding

---

**4.** *See also Trimed, Inc. v. Sherwood Med. Co.,* 977 F.2d 885, 893 (4th Cir.1992); *Spotsylvania County School Bd. v. Seaboard Sur. Co.,* 243 Va. 202, 415 S.E.2d 120, 128–29 (1992); *Shivers v. John H. Harland Co.,* 310 S.C. 217, 423 S.E.2d 105, 107–08 (1992); *Mississippi Power Co. v. Cochran,* 167 Miss. 705, 147 So. 473, 475 (1933); *Martin v. U-Haul Co. of Fresno,* 204 Cal.App.3d 396, 408–09, 251 Cal. Rptr. 17 (Cal.Ct.App.1988).

lost profits for a period longer than thirty days elevated Sam's Janitorial to a better position than it would have been in had the OA given the required amount of notice of termination.

While lost profits must be limited to the termination period, "the termination notice period does not necessarily and under any and all circumstances set the parameters" for all provable damages. *Keystone Floor Prods. Co. v. Beattie Mfg. Co.*, 432 F.Supp. 869, 882 (E.D.Pa.1977). For example, certain reliance damages, such as costs incurred or losses sustained in expectation of the relationship continuing for at least the notice period, may flow from breach of a notice agreement. *Mach. Maint. & Equip. Co.*, 634 F.Supp. at 371. Additionally, damages for failure to give the required notice might also include the loss in value of a business as a going concern. *Royal's Reconditioning Corp. v. Royal*, 293 Ill.App.3d 1019, 228 Ill.Dec. 365, 689 N.E.2d 237, 241 (1997).

At trial, Sam's Janitorial only sought damages under its breach of contract claim for the loss of profits it sustained through the end of all nine contracts. It did not seek any other expectancy damages or damages for the loss in value of the business due to the failure to give required notice and did not present any evidence regarding such. It also sought damages for the profits it lost during the debarment period, presenting evidence that after the debarment, it was unable to obtain any other contracts in Missouri or several other states. The trial court, however, did not award any damages under its claim that the debarment was unlawful, and Sam's Janitorial did not appeal that part of

the judgment. Accordingly, any award of damages stemming from the unlawful debarment is foreclosed and should not be considered on remand.

The trial court erred in awarding Sam's Janitorial lost profits that would have accrued through the ending dates of the nine contracts. The damages award is, therefore, reversed, and the case is remanded to the trial court to calculate lost profit damages consistent with this opinion.[5]

The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded with directions.

Judge MARTIN concurs.

Judge AHUJA concurs in separate concurring opinion.

ALOK AHUJA, Judge, concurring.

I agree with the majority's affirmance of the trial court's finding that the State breached its contracts with Asamoah–Boadu by terminating those contracts based on his purported violation of federal law. I also concur in the majority's reversal of the trial court's damages award, based on its conclusion that *Buckley v. Coe*, 385 S.W.2d 354, 358–59 (Mo.App.1964), and *Machine Maintenance & Equipment Co. v. Cooper Industries*, 634 F.Supp. 367, 371 (E.D.Mo.1986), limit Asamoah–Boadu's recoverable damages to those which accrued during the 30–day notice period contained in the contracts' termination-for-convenience provision. I write separately, however, because I believe the damages issue presents a close question, and one on which—but for the prior decisions in *Buck-*

---

5. While this court has the authority under Rule 84.14 to "give such judgment as the court ought to give," it is unable to modify the damages award on the record presented on appeal. Apparently, the parties had stipulated as to what the monthly gross income would have been on the contracts, which is necessary to calculate lost profits for thirty days. However, such stipulation was not included in the record on appeal or exhibits; thus, remand is necessary.

*ley* and *Machine Maintenance*—Asamoah–Boadu might well be entitled to prevail.

The State did not invoke the termination-for-convenience provision when it terminated Asamoah–Boadu's contracts on March 6, 2007. Instead, it relied solely on Asamoah–Boadu's purported violation of federal immigration law. After a trial, the circuit court found that Asamoah–Boadu had not in fact violated federal law, and that the termination of Asamoah–Boadu's contracts was therefore unlawful. The circuit court also found, as a fact, that the State had not relied on the termination-for-convenience provision, and that no evidence was presented that the State *would have* terminated Asamoah–Boadu's contracts under the termination-for-convenience provision:

> Defendants did not terminate Plaintiff's contracts based upon any 30–day provision. *Defendants produced no evidence indicating that they would have terminated Plaintiff's contracts for any reason other than the charge that he violated Federal employment law.*

(Emphasis added.)

The majority of cases involving this situation—a defective for-cause termination[6] —appear to reach the same result we do here, and hold that the terminated party's damages are limited to the notice period contained in the termination-without-cause provision. *See* cases cited in the majority

opinion at note 4. There *are* cases reaching contrary outcomes, however. Thus, in *Chevrolet Motor Co. v. Gladding*, 42 F.2d 440 (4th Cir.1930), the court refused to permit an automobile manufacturer, which had improperly terminated a dealership for cause, to limit its damage exposure based on the 60–day notice period applicable to terminations without cause:

> When a party to a contract elects to cancel it under one or more alternative provisions conferring such a privilege, he should assign his cause and abide by it. He cannot assign one cause and cancel it, then, after being sued for wrongful cancellation, come into court and say he erred in respect of the cause assigned, but another cause does exist, and he is not liable.

*Id.* at 445. And in *Reiver v. Murdoch & Walsh, P.A.*, 625 F.Supp. 998 (D.Del.1985), the court held that whether a defective termination for cause should be treated as a termination without cause was a factual question not amenable to resolution as a matter of law. *Id.* at 1009.

In the absence of *Buckley* and *Machine Maintenance*, I believe a strong argument could be made for deferring to the trial court's factual findings that the State did not invoke, and would not have invoked, the termination-for-convenience provision. In seeking to limit Asamoah–Boadu's damages to the 30–day notice period, the State makes what seems to be, at bottom, a factual argument: that it would have ter-

**6.** I believe the present case—which involves a wrongful exercise of for-cause termination authority—must be distinguished from cases in which the terminating party terminates a contract without cause, but fails to give the terminated party the benefits (such as notice, or severance payments) which the contract requires in the event of such a without-cause termination. *See, e.g., Smalley Transp. Co. v. Bay Dray, Inc.*, 612 So.2d 1182, 1188 (Ala. 1992); *Royal's Reconditioning Corp. v. Royal,* 293 Ill.App.3d 1019, 228 Ill.Dec. 365, 689 N.E.2d 237, 240–41 (1997) (collecting cases). In those cases, the termination was not itself wrongful; the terminating party simply failed to give the other contracting party what was bargained for in the event of such a termination. Those cases do not involve the more difficult question presented here: whether a defective for-cause termination, invoking one provision of a contract, should be treated as if it were a without-cause termination under a *separate* contractual provision.

minated Asamoah–Boadu's contracts for convenience, even in the absence of any violation of federal law. After a trial, the circuit court found no evidence that this would, in fact, have occurred (I presume the burden of proof on this issue would properly fall on the defendant). I have difficulty understanding why, in the face of such a factual finding, we must *irrebuttably presume* that the State would have terminated Asamoah–Boadu's contracts for convenience—even if Asamoah–Boadu was in full compliance with the contracts' material terms—merely because it attempted to terminate the contracts based on the erroneous belief that cause existed.[7]

The State *could have* included language in the contracts "converting" a defective for-cause termination into a termination for convenience. The Federal Acquisition Regulation requires the inclusion in certain government contracts of a specific provision stating that "[i]f it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience." *See* 48 C.F.R. 52.212–4(m) (2010). Similar provisions have apparently been included in federal government contracts for some time. *See, e.g., United States v. Lennox Metal Mfg. Co.,* 225 F.2d 302, 316 ¶ 5 (2d Cir.1955). I am troubled that, even though the State failed to include such language in Asamoah–Boadu's contracts, and address the issue explicitly, we now give it the benefit of that omitted provision by limiting Asamoah–Boadu's damages to those which would be available under the termination-for-convenience provision.

Despite these reservations, Missouri caselaw appears to follow the majority approach on this issue, and I accordingly concur in the majority opinion, including its reversal of the damages award.

7. Framing the issue in terms of the parties' reasonable expectations as of the time of contracting does not necessarily remove this difficulty. It is not self-evident that at the time of contracting the parties reasonably expected that an unfounded for-cause termination would be read to include an invocation (in the alternative) of the termination-for-convenience provision, particularly when language could have been included in the agreement, or in the notice of termination, to make that result explicit.