**Joseph A. MAY, Respondent,**

**v.**

**James WILLIAMS, Wendy Williams, and J. Williams Trucking, Appellants.**

**WD 79651**

Missouri Court of Appeals, Western District.

OPINION FILED: August 1, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied September 5, 2017

Application for Transfer Denied November 21, 2017

Richard Hicks, Columbia, MO, Counsel for Appellants.

William Nacy, Jefferson City, MO, Counsel for Respondent.

Before Division One: James Edward Welsh, P.J., Lisa White Hardwick, and Gary D. Witt, JJ.

1. We refer to James Williams, Wendy Williams, and J. William Trucking collectively

James Edward Welsh, Presiding Judge

James Williams, Wendy Williams, and J. Williams Trucking[1] appeal the circuit court's judgment awarding Joseph A. May actual damages in the amount of $116,516.57, finding that All-Type Construction, Excavation, and Trucking, L.L.C, and the Williamses were jointly and severally liable on May's claims for breaches of contracts and violations of the Missouri Uniform Fraudulent Transfer Act. The circuit court also awarded $5,000 in punitive damages, $33,200 in attorney's fees, and interest on all of these amounts. On appeal, the Williamses assert that the circuit court: (1) erred in finding that a contract for the use of a trailer existed between May and All-Type Construction; (2) erred in finding actual damages in the amount of $116,516.57 for breaches of contracts by All-Type Construction; (3) erred in ruling that the Williamses violated the Missouri Uniform Fraudulent Transfer Act by making unauthorized distributions and transfers with actual intent to hinder, delay or defraud May as a creditor; (4) abused its discretion in awarding punitive damages; (5) abused its discretion in awarding attorney's fees; and (6) erred in awarding interest on the awards of punitive damages and attorney's fees. We affirm in part and reverse in part.

All-Type Construction was a Missouri limited liability company organized on April 26, 2004. Trent W. Quinn and James Williams were the only members. Quinn was All-Type Construction's president, and James Williams was its secretary and treasurer. All-Type Construction was in the business of hauling asphalt and other construction materials. The business required the use of heavy duty trucks.

as "the Williamses" when referring to them as the appellants in this case.

At its inception, All-Type Construction needed to obtain a loan to purchase two dump trucks and contacted Central Trust Bank in Jefferson City, Missouri, for a loan. To obtain a loan from the bank, All-Type Construction needed to show a certain amount of capital on hand. Thus, in April 2004, Quinn and James Williams each deposited $25,000 in All-Type Construction's checking account. James Williams borrowed the $25,000 from his parents to deposit in All-Type Construction's account. Central Trust Bank loaned All-Type Construction $131,000 to purchase two Mack dump trucks that were collateral for the loan. Quinn and his wife and James Williams and Wendy Williams were personally liable as guarantors for the loan.

With the loan money, All-Type Construction purchased a blue 1998 Mack truck for $67,750 and purchased a 1999 white Mack truck.[2] James Williams drove the blue truck, and Quinn drove the white truck. In the fall of 2004, All-Type Construction sold the white Mack truck, leaving a balance of $61,124.52 on the loan from Central Bank. According to Quinn, he began having problems with the white truck, so he leased a new truck but used a different lender.

To more effectively compete in the business, James Williams and Quinn believed that another dump truck would allow the company to haul more material. They also thought having a pickup truck with All-Type Construction's advertising on it would both give Quinn some personal transportation and would impress business prospects. Both Quinn and James Williams knew of Dr. Joseph May, a dental specialist from Jefferson City, Missouri, and viewed May as a financial resource, along with the bank.

On or about October 2, 2004, All-Type Construction, by and through Quinn, entered into a two-year lease agreement to use a 2002 Ford F250 Super Crew pickup truck owned by May. Quinn entered this lease for the pickup truck with James Williams's knowledge and approval. The lease agreement required a $600 monthly payment and required All-Type Construction to pay maintenance and insurance, together with sales taxes, licensing, and registration of $3,000. The lease agreement also provided that mileage of 500 miles per month average was allowed on the pickup truck and that mileage in excess of that would be charged at 20 cents a mile. The pickup truck started out with 20,000 miles on it, but it had close to 80,000 miles on it when May got the truck back about a year later. All-Type Construction made no lease payments on the truck and never paid the $3,000 for sales taxes, licensing, and registration.

In the fall of 2004, Quinn discussed with May about getting May's son involved in All-Type Construction's business and suggested that May invest in a Mack dump truck for All-Type Construction's use. Thereafter, May purchased a 2005 Mack dump truck for $140,000. In August 2005, All-Type Construction, by and through Quinn, entered into two written lease agreements with May for use of the Mack dump truck. Quinn entered these agreements with James Williams's knowledge and approval. The "lease with option to purchase agreement" for the Mack dump truck was executed on August 20, 2005, and carried a term from September 1, 2005, to December 31, 2006. The monthly payment was set at $2,500, which covered May's bank loan payments and insurance cost. The agreement also provided that All-Type Construction would pay May

2. The record does not reflect the purchase price of the white Mack truck, but May and the Williamses agree that it was around $64,000.

"50% of the profits that the truck earns over the cost of maintenance, fuel and driver for the period of this lease." The "equipment lease agreement" for the Mack dump truck was executed on August 27, 2005, and carried a term from September 1, 2005, to December 31, 2009. The monthly payment was set at $2,500, and All-Type Construction was to pay for maintenance and insurance. The equipment lease agreement did not mention the lease with option to purchase agreement. All-Type Construction made only four payments on May's Mack dump truck, totaling $10,000. Shortly after acquiring May's Mack dump truck, Quinn and James Williams began discussions about taking their trucks and working in New Orleans, Louisiana, to help with the ongoing hurricane clean-up.

By December 2005, however, James Williams and Quinn had a falling out, and James Williams stopped working and refused to return any of Quinn's telephone calls. In that same month, Central Trust Bank began calling James Williams about All-Type Construction's being behind in its payments on the loan for the blue Mack truck. The bank told James Williams that, if the payments were not made, the bank would repossess the truck and that the guarantors of the loan would be liable for any deficiency. The payoff amount on the loan was $49,195.84. The bank did not call Quinn, and Quinn did not know that the bank was calling James Williams about the status of the loan.

James Williams and his wife, Wendy, then formed their own corporation, J. Williams Trucking, Inc., in December for the purpose of performing work similar to All-Type Construction. James Williams did not inform Quinn about forming the new company. To equip J. Williams Trucking for business, James Williams applied for a new title for All-Type Construction's blue 1998 Mack truck. James Williams stated on the application that the owner of the truck was J. Williams Trucking and did not mention All-Type Construction anywhere on the application. James Williams certified in the affidavit that accompanied the title application that the reason for the new title was "Changing Company name & lienholder[.] No change in ownership.[.]" James Williams did not tell Quinn anything about the intended re-titling of the truck. In addition to re-titling the blue Mack dump truck, James Williams obtained a $50,000 personal loan from Commerce Bank and paid off the $49,195.84 that All-Type Construction still owed Central Trust Bank for the loan it had obtained to purchase the blue Mack truck. James Williams did not tell Quinn anything about paying off the loan with Central Trust Bank. In addition to taking the blue Mack truck, Williams took $20,000 worth of tools used in All-Type Construction's business.

In early spring of 2006, Quinn and other employees of All-Type Construction traveled to New Orleans with Quinn's and May's Mack dump trucks to pursue hurricane cleanup work. Quinn, on behalf of All-Type Construction, asked May to purchase a trailer for the employees to have a place to sleep while in Louisiana. May agreed to purchase the trailer, and the trailer was purchased in Louisiana for $4,000. All-Type Construction never made any payments to May for use of the trailer. While in Louisiana, May's Mack truck and trailer were stolen.

Between May 2005 and June 2006, May gave checks totaling $9,100 to All-Type Construction and Quinn for things such as repairs and to pay other bills. May also paid for the truck's insurance in the amount of $17,843.62 and allowed All-Type Construction to use a credit card and amass $12,698.39 in credit card debt. May also lost his $4,000 trailer that he allowed All-Type Construction to use, and May paid for new tires and repairs for his Mack

dump truck, which totaled $17,374.56. All-Type Construction owed May at least $52,-500 [3] for unpaid lease payments on the Mack dump truck and the Ford pickup truck and $3,000 for the pickup truck's taxes, licensing, and registration.

Between May 2004 and October 2005, checks totaling $42,400 were written on All-Type Construction's checking account and were made out to "Jim Williams," except for a check for $25,000, which was made out to James Williams's parents, "John L. & Rosemary Williams." All of the checks were allegedly signed by Trent Quinn. James Williams admitted to filling out each of the checks and also admitted to signing Quinn's name as the check signer "a few times." Quinn testified at trial that he did not sign any of these checks.

On January 3, 2008, Quinn, as president of All-Type Construction, assigned "all personal property of [All-Type Construction] and unauthorized distributions by James L. Williams to Joseph A. May for collection by any legal means available." Quinn also assigned "all interest and personal property of James L. Williams in [All-Type Construction] as allowed by law to be collected, prosecuted and enforced against James L. Williams (and this LLC) including the unauthorized distributions[.]" On September 15, 2008, May filed a petition with the circuit court seeking damages for breaches of contracts and for violations of the Missouri Uniform Fraudulent Transfer Act. May also sought punitive damages and attorney's fees and costs.

After a one day trial before the circuit court on April 3, 2015, the circuit court entered its judgment on December 30, 2015. The circuit court found that May and All-Type Construction had valid written contracts for May's pickup truck and Mack dump truck and had a valid oral contract for the trailer. The court concluded that All-Type Construction breached its contracts with May by failing to pay May for the pickup truck, Mack dump truck, and trailer as required by the contracts and that All-Type Construction was liable for damages in the amount of $116,516.57.

The circuit court also concluded that James Williams had made unauthorized distributions to himself, Wendy Williams, and J. Williams Trucking, with actual intent to hinder, delay, or defraud All-Type Construction's creditors, including May, in violation of the Missouri Uniform Fraudulent Transfer Act. The circuit court found that James Williams wrote and signed checks totaling $42,400 on All-Type Construction's checking account and diverted the monies represented by the checks away from All-Type Construction to himself, his wife, and his own corporation. The court also found that James and Wendy Williams retained possession of the monies represented by the checks, the blue 1998 Mack truck, and company tools for their own use and that they never disclosed the transfers of this property to All-Type Construction or Quinn. According to the court, All-Type Construction became insolvent shortly after the transfers were made, and it could not pay May under its contracts. The circuit court concluded, that as a direct and proximate result of these transfers, May was damaged in the amount of $116,516.57 and that the Williamses were liable to May for this amount because, but for their actions in transferring these assets from All-type Construction, All-Type Construction would have been able to pay May the debts owed to him under the contracts.[4]

---

3. In its judgment, the circuit court found that May was out $52,500 for unpaid lease payments.

4. In its judgment, the circuit court noted that it was awarding actual damages in the amount of $116,516.57 "against Defendants All-Type, L.L.C., James Williams, Wendy Williams, and J. Williams Trucking, and said

The circuit court also awarded May $5,000 as punitive damages because it found that the Williamses' conduct was unconscionable and made with the intent to cause May damages. Further, the circuit court awarded May attorney's fees in the amount of $33,200 and stated that May was "entitled to interest on all the foregoing amounts from the date the petition was filed because [May] made demand prior to filing suit." The Williamses appeal.

In their first point on appeal, the Williamses contend that the circuit court erred in finding that a contract for the use of a trailer existed between May and All-Type Construction. The Williamses assert that there were no essential terms agreed upon between May and All-Type Construction because no evidence existed regarding the terms for use of the trailer and regarding the price for use of the trailer. We disagree.

■ In reviewing a court-tried case, we will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We view the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Asamoah-Boadu v. State of Mo., Office of Admin.*, 328 S.W.3d 790, 793 (Mo. App. 2010). We defer to the circuit court's credi-

bility determinations but review issues of law de novo. *Id.* "Questions of interpretation and application of a contract are reviewed de novo as a matter of law." *In re Estate of Merrit ex rel. Merritt v. Wachter*, 428 S.W.3d 738, 742 (Mo. App. 2014).

■ The evidence established that, in early spring of 2006, Quinn and other employees of All-Type Construction traveled to New Orleans with Quinn's and May's Mack dump trucks to pursue hurricane cleanup work. According to Quinn, the Federal Emergency Management Agency was supposed to have tents set up for workers to stay in, but when they got to Louisiana there was no room for them in the tents. Therefore, Quinn, on behalf of All-Type Construction, asked May to purchase a trailer for the employees to have a place to sleep while in Louisiana. May agreed to purchase the trailer, and the trailer was purchased in Louisiana for $4,000. Quinn said that, after working in New Orleans, he left May's Mack truck and the trailer in Louisiana to be picked up later. When he later returned to Louisiana, he discovered that the Mack truck and trailer had been stolen. The trailer was never recovered, and All-Type Construction never made any payments to May for the trailer.

■ Such evidence was sufficient to establish an oral contract between All-Type Construction and May and a breach of that contract.[5] All-Type Construction,

---

defendants shall be held jointly and severally liable."

5. Indeed, this oral contract was akin to a bailment. "'A "bailment" in its ordinary legal sense signifies a contract resulting from the delivery of a thing by the bailor to the bailee with the condition that it be restored to the bailor in accordance with his directions as soon as the purpose for which it was bailed is satisfied.'" *Excel Bank v. Nat'l Bank of Kansas City*, 290 S.W.3d 801, 804 (Mo. App 2009) (citation omitted). "A contract for bailment may be written, oral, express or implied."

*Stone v. Crown Diversified Indus. Corp.*, 9 S.W.3d 659, 669 (Mo. App. 1999). "For a bailment contract to exist, there must be delivery by the bailor and acceptance by the bailee of the subject matter of the bailment." *D.S. Sifers Corp. v. Hallak*, 46 S.W.3d 11, 16 (Mo. App. 2001). "'Where the bailor pleads and presents evidence of breach of the bailment contract by the bailee failing to return the article in an undamaged condition, the burden of proof is on the bailee to plead and provide due care on its part [.]'" *Id.* (citation omitted).

through Quinn, asked May to purchase a trailer for All-Type Construction. Quinn found a trailer in Louisiana, and May purchased the trailer for $4,000 for All-Type Construction. " 'The existence of a contract necessitates a "meeting of the minds" which the court determines by looking to the intention of the parties as expressed or manifested in their words or acts.' " *Cent. Mo. Prof'l Servs., Inc. v. Shoemaker*, 108 S.W.3d 6, 9 (Mo. App. 2003). The evidence established a meeting of the minds between May and Quinn on behalf of All-Type Construction. Quinn asked May to purchase a $4,000 trailer for All-Type Construction, and May purchased the trailer for All-Type Construction. We find no error in the circuit court's determination that a binding oral contract existed between the parties.

▇▇ In their second point on appeal, the Williamses contend that the circuit court erred in finding actual damages in the amount of $116,516.57 for All-Type Construction's breaches of the agreements with May for the Ford pickup truck, the Mack dump truck, and the trailer. The Williamses assert that the circuit court awarded damages unrelated and outside the scope of the terms of the written contacts and awarded damages for an oral contract for the trailer that did not legally exist. We disagree.

The evidence established that All-Type Construction entered into a lease agreement with May for the Mack dump truck and agreed to pay $2,500 monthly, in addition to the cost of maintenance, taxes, and insurance. Although the lease was for 52 months, in December 2007, May made a

demand on All-Type Construction for unpaid lease payments in the amount of $52,500 for the Mack dump truck. At trial, May noted that, even giving All-Type Construction credit for the $10,000 that it paid under the lease, All-Type Construction did not make any further payments throughout the term of the lease.[6] The evidence further established that May paid for the truck's insurance in the amount of $17,843.62, paid for repairs and new tires for the truck in the amount of $17,374.56, and paid for repairs and other bills in the amount of $21,798.39. May testified at trial that he sold the Mack truck "not long ago" to a dealer for $75,000.

The evidence also established that All-Type Construction entered into a lease agreement with May for the Ford pickup truck and agreed to pay $600 monthly and the costs of maintenance and insurance, together with sales taxes, licensing, and registration of $3,000. The lease agreement also provided that mileage of 500 miles per month average was allowed on the pickup truck and that mileage in excess of that would be charged at 20 cents a mile. The pickup truck started out with 20,000 miles on it, but it had close to 80,000 miles on it when May got the truck back about a year later. Although the lease for the pickup truck was for 24 months, May acknowledged that he sold the pickup truck after a year. All-Type Construction made no lease payments on the truck and never paid the $3,000 for sales taxes, licensing, and registration.

Finally, as we previously found in regard to the Williamses' first point on appeal, the evidence established that May

---

**6.** At trial, May's attorney erroneously stated, and May erroneously agreed, that the term of the lease for the Mack dump truck was 5 years and 3 months and that the total due under the lease was $157,500. The term of the lease was 4 years and 4 months; therefore, the total due under the lease would have been $130,000. The Williamses assert, without explanation, that All-Type Construction would have been responsible only for the lease payments from September 2005 through September 2006 when the truck was stolen. The circuit court, however, did not agree, and nor do we.

and All-Type Construction entered into an oral contract for a $4,000 trailer.

The circuit court entered judgment against All-Type Construction on May's claims for breach of contracts in the amount of $116,516.57. "When the trial court calculates an amount that is 'within the range of evidence,' an appellate court generally will decline to find the determination erroneous or to weigh the evidence." *Brittany Sobery Family Ltd. P'ship v. Coinmach Corp.*, 392 S.W.3d 46, 52 (Mo. App. 2013) (citation omitted). " '[A] trial court in a case tried without a jury has the prerogative to make a finding of value within the range of values testified to at trial on the issues of damages.' " *Jerry Bennett Masonry, Inc. v. Crossland Const. Co., Inc.*, 171 S.W.3d 81, 95 (Mo. App. 2005) (citation omitted). Thus, because we defer to the circuit court's findings as to credibility and weight, and because the circuit court's calculation of damages was within the range of the evidence presented, we find that the circuit court did not err in entering judgment against All-Type Construction in the amount of $116,516.57.

In their third point on appeal, the Williamses assert that the circuit court erred in ruling that the Williamses violated the Missouri Uniform Fraudulent Transfer Act by making unauthorized distributions and transfers with actual intent to hinder, delay, or defraud May as a creditor. In particular, the Williamses contend that some of the alleged assets transferred were not assets of All-Type Construction, that they were not debtors to May, and that any alleged transfer of assets was not done with actual intent or purpose to hinder, delay, or defraud May as a creditor.

Under the Missouri Uniform Fraudulent Transfer Act, "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]" § 428.024.1(1), RSMo 2016. Thus, to prevail on a claim under the Missouri Uniform Fraudulent Transfer Act, the creditor must prove a transfer of assets was made by a debtor with an actual intent to hinder, delay, or defraud a creditor of the debtor. *Higgins v. Ferrari*, 474 S.W.3d 630, 636 (Mo. App. 2015). " 'The burden of proof is on the creditor[.]' " *Id.* (citation omitted).

In this case, May contends that because he filed a petition against James Williams, Wendy Williams, and J. Williams Trucking claiming that they were liable on the claims he made in his petition, and because the circuit court identified the Williamses as debtors, that this somehow establishes that the Williamses were indeed debtors. We disagree.

Section 428.009(4) and (6) of the Missouri Uniform Fraudulent Transfer Act defines "creditor" as "a person who has a claim" and "debtor" as "a person who is liable on a claim." A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 428.009(3), RSMo 2016. In this case, May's right to payment came from All-Type Construction. The debtor on May's claims, therefore, was All-Type Construction—not James Williams, Wendy Williams, and J. Williams Trucking. Indeed, section 347.057, RSMo 2016, provides:

A person who is a member, manager, or both, of a limited liability company is not liable, solely by reason of being a member or manager, or both, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract,

tort or otherwise or for the acts or omissions of any other member, manager, agent or employee of the limited liability company.

Thus, limited liability companies (LLC) "are ordinarily considered separate legal entities that are distinct from their members or owners," and "[m]embers are generally not liable for the entity's debts." *Hammett v. Atcheson*, 438 S.W.3d 452, 461 (Mo. App. 2014). We recognize, however, that this protection of limited liability for members of an LLC is not absolute. *Id.* Indeed, " '[w]here a corporation [or an LLC] is used for an improper purpose and to perpetuate injustice by which it avoids its legal obligations, equity will step in, pierce the corporate veil and grant appropriate relief.' " *Id.* (quoting *Hibbs v. Berger*, 430 S.W.3d 296, 306 (Mo. App. 2014)). May, however, did not seek to pierce the corporate veil in this case through an action in equity; instead, May sought, without attempting to pierce the corporate veil of All-Type Construction, to hold James Williams, individually, liable under the Missouri Uniform Fraudulent Transfer Act for the claims that it had against All-Type Construction.[7] The Missouri Uniform Fraudulent Transfer Act, however, does not sweep so broadly. Without piercing All-Type Construction's corporate veil, James Williams could not be a debtor for the purposes of the Missouri Uniform Fraudulent Transfer Act.

We recognize that, in *Fischer v. Brancato*, 147 S.W.3d 794, 800 (Mo. App. 2004), this court's Eastern District concluded

that because a creditor sufficiently pleaded and tried his cause of action for conspiracy to engage in a fraudulent conveyance under the Missouri Uniform Fraudulent Transfer Act, the creditor was entitled to relief, "regardless of whether he pleaded piercing the corporate veil or alter ego as separate causes of action." In *Fischer*, a corporate entity was not the debtor. *See 8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 451 (Mo. App. 2009) (court recognized that the individual defendant in *Fischer* was the debtor and that the corporations were not debtors on the avoided debt). In regard to its comment about it being unnecessary for a creditor to plead piercing the corporate veil as a separate cause of action, the *Fischer* court was referring to it being unnecessary to hold other defendants liable for the debtor's debts by piercing the corporate veil when the court could just void the transfers of debtor's income to these entities. *Fischer*, 147 S.W.3d at 800-01. In our case, however, the circuit court, without any specific pleadings by May and without any findings by the circuit court regarding piercing of All-Type Construction's corporate veil, concluded that James Williams *was the debtor* and then held James Williams, Wendy Williams, and J. Williams Trucking personally and jointly and severally liable for the debts. Absent a determination regarding the piercing of All-Type Construction's corporate veil, James Williams could not be found to be the debtor under the Missouri Uniform Fraudulent Transfer Act.

---

7. We recognize that Quinn assigned "all personal property of [All-Type Construction] and unauthorized distributions by James L. Williams to Joseph A. May for collection by any legal means available." Quinn also assigned "all interest and personal property of James L. Williams in [All-Type Construction] as allowed by law to be collected, prosecuted and enforced against James L. Williams (and this LLC) including the unauthorized distribu-

tions[.]" In his petition, however, May did not seek, pursuant to the terms of the assignment of claims agreement with Quinn, to set forth All-Type Construction's claims against Williams. Instead, May set forth his own claims against All-Type Construction for breaches of contracts and attempted to set forth a claim under the Missouri Uniform Fraudulent Transfer Act as a creditor against a debtor.

Moreover, section 428.039, RSMo 2016, provides the remedies that a creditor may seek under the Missouri Uniform Fraudulent Transfer Act. That section states:

1. In an action for relief against a transfer or obligation under sections 428.005 to 428.059, a creditor, subject to the limitations in section 428.044, may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable laws of this state;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(a) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(c) Any other relief the circumstances may require.

2. If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

In this case, the circuit court's judgment did not declare avoidance of the transfer, attachment, or injunctive relief; instead, the circuit court found James Williams, Wendy Williams, and J. Williams Trucking jointly and severally "liable to [May] for [$116,526.57] [8] because, but for their actions in transferring Defendant All-Type's assets, All-Type would have been able to pay [May] its debts to him under the contracts." [9] The circuit court went beyond the remedies that a creditor may seek under the Missouri Uniform Fraudulent Transfer Act.

We, therefore, reverse the circuit court's judgment in regard to May's claims under the Missouri Uniform Fraudulent Transfer Act. James Williams, Wendy Williams, and J. Williams Trucking were not debtors and could not be held jointly and severally liable for All-Type Construction's debts to May.

In their remaining points on appeal, the Williamses complain about the circuit court's award of punitive damages, attorney's fees, and prejudgment interest on the award of punitive damages and attorney's fees. The circuit court found that punitive damages were warranted because the Williamses conduct in regard to the fraudulent transfer of assets "was unconscionable and made with the intent to cause [May] damages." Because, however, we are reversing the circuit court's judgment in regard to May's claims under the Missouri Uniform Fraudulent Transfer Act, we must also reverse the circuit court's judgment awarding punitive damages. In regard to attorney's fees, generally "'[a]bsent statutory authorization or contractual agreement, each litigant must bear the cost of its own attorney's fees.'" *Taylor v. Clark*, 140 S.W.3d 242, 257 (Mo. App. 2004) (citation omitted). May does not

---

8. This amount is the same amount that the circuit court found in regard to the breach of contract count. The circuit court found that All-Type Construction breached its contracts with May for the pickup truck, the Mack dump truck, and the trailer and that May was damaged in the amount of $116,516.57.

9. In his petition, May correctly sought the appropriate remedies under section 428.039 in that he stated that he was entitled to "an avoidance of said defendants' transfers/obligations, and attachment thereto, and/or an injunction against further disposition of assets."

assert that attorney's fees were statutorily authorized or that the contracts provided for the payment of attorney's fees. May merely argues that he is entitled to attorney's fees because of the Williamses intentional misconduct in fraudulently transferring All-Type Construction's assets. Again, however, because we are reversing the circuit court's judgment in regard to May's claims under the Missouri Uniform Fraudulent Transfer Act, we must also reverse the circuit court's award of attorney's fees. Finally, because we are reversing the circuit court's judgment for punitive damages and attorney's fees, we need not address the Williamses' final point on appeal that the circuit court erred in ordering them to pay prejudgment interest on the awards of punitive damages and attorney's fees. The Williamses would no longer be liable for any prejudgment interest on the awards of punitive damages and attorney's fees.

## Conclusion

We affirm the circuit court's judgment in the amount of $116,516.57 against All-Type Construction on May's claims for breaches of contracts. We reverse the circuit court's judgment against James Williams, Wendy Williams, and J. Williams Trucking on May's claim for violations of the Missouri Uniform Fraudulent Transfer Act. We also reverse the circuit court's judgment awarding punitive damages and attorney's fees to May and any prejudgment interest on these awards.

All concur.